

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

WK:KTF
F. #2018R00906

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 6, 2019

<u>By ECF and FedEx</u>

The Honorable Joanna Seybert
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

        Re:    United States v. Dennis Verderosa
                  Criminal Docket No. 17-372 (Deft. No. 13) (JS)

Dear Judge Seybert:

        The government respectfully submits this letter in anticipation of sentencing, scheduled for Thursday, September 12, 2019, at 11:00 a.m.  For the reasons set forth below, the government respectfully requests that the Court sentence defendant Dennis Verderosa to a term of 72 months' incarceration as recommended by the United States Probation Department ("Probation").  The government also requests that the Court delay entering an order of restitution pending the government's provision, within 90 days, of detailed victim loss information.[1]

I.    <u>Procedural Background</u>

        On July 11, 2017, a grand jury in the Eastern District of New York returned an eight-count indictment (the "Indictment") charging the defendant and fifteen co-defendants with securities fraud-related crimes.  Specifically, Verderosa was charged with conspiracy to commit securities fraud (Count One), conspiracy to commit wire fraud (Count Two) and substantive securities fraud (Counts Three, Five, Six and Seven).  The remaining counts, in which the defendant is not charged, allege securities fraud (Counts Four and Eight) and money laundering (Count Nine).  On April 25, 2018, pursuant to a plea agreement, the defendant pleaded guilty to Count Two of the Indictment.

---

[1] The government anticipates that total restitution will be in the range of approximately $14.6 to $16.5 million.

II. Factual Background

The facts of this case are set forth in detail in the Presentence Investigation Report ("PSR"), dated November 15, 2018. The criminal scheme and Verderosa's conduct are summarized below.

Verderosa, the fifteen additional charged defendants and others participated in a successful, multi-year scheme to defraud investors and potential investors in publicly traded companies. The defendants engaged in their scheme by artificially controlling the price and volume of traded shares in these companies through artificially generating price movements and trading volume in the shares and making material misrepresentations and omissions in their communications with victims, relating to, among other things, the advisability of purchasing the manipulated stock and the ways in which the defendants profited from any victim's stock purchase. The Indictment focuses on five publicly traded companies promoted by the scheme: CES Synergies, Inc. ("CESX"), National Waste Management Holdings, Inc. ("NWMH"); Grilled Cheese Truck ("GRLD"); Hydrocarb Energy Corporation ("HECC") and Intelligent Content Enterprises, Inc. ("ICEIF"). The scheme's corrupt stock promotion, however, was not limited to these five issuers and included other public companies in which members of the scheme owned shares. (See, e.g., PSR ¶ 67, (victim estimating $100,000 loss from Verderosa's direction to buy stock of companies with symbols SPYR and INWP, in addition to ICEIF)). All the companies corruptly promoted by the scheme are referred to, collectively, as the "Manipulated Public Companies."

Verderosa's role in this scheme, as discussed below in greater detail, was as a cold-caller and account executive.

A. The Scheme's Hubs

During the charged time period, approximately January 2014 through July 2017, the scheme used two purported financial service businesses—which were, in fact, boiler room operations[2]—to promote the stocks of publicly traded companies to individual victims, primarily through cold-call campaigns, newsletter circulation and posting information on websites. (PSR

---

[2] The Securities and Exchange Commission defines boiler room schemes as follows:

> Boiler room schemes are large-scale operations designed to lure in as many investors to an investment scam as possible, often using high-pressure sales tactics. Boiler room scheme operators may cold call investors or solicit investors through emails, text messages, social media, and other means. Boiler room scheme tactics may be used to perpetrate microcap fraud, binary options fraud, advance fee fraud, and other investment scams.

(https://www.sec.gov/fast-answers/answersboilerhtm.html, visited April 7, 2019).

¶¶ 4-5). Elite Stock Research ("ESR"), headquartered in Plainview, New York, was the first, serving as the scheme's primary hub for the corrupt promotion of stock between approximately August 2013 and July 2014.[3] (See PSR ¶ 5). The second, which we refer to as the "Boiler Room," was headquartered in Melville, New York, and replaced ESR as the scheme's primary hub for the corrupt promotion of stock between approximately August 2014 and July 12, 2017, the date on which Verderosa and the majority of the other defendants were arrested. (See PSR ¶ 4).[4] Many of the defendants indicted alongside Verderosa worked first at ESR, and subsequently at the Boiler Room; ESR promoted some of the same publicly traded companies' stocks that the Boiler Room promoted. Verderosa joined the scheme in approximately January 2014, and was present during the transition from ESR to the Boiler Room. He worked as a cold-caller and, primarily, as an account executive at the Boiler Room until his arrest. (See PSR ¶ 75).

   B.  The Stock Manipulation

Insiders associated with the Manipulated Public Companies—defendants Chartier, Lee, Isen, Watts and Gleckman (collectively, the "Insiders")—financed the scheme by providing shares of the Manipulated Public Companies and, at times, cash, to the defendants operating ESR and the Boiler Room—defendants Matz, Hardy and Vassallo (collectively, the "Operators"). The Insiders transferred shares to the Operators through fraudulent stock purchase and consulting agreements, which falsely provided that the transfers were compensation for consulting services. In fact, the Insiders transferred these shares as a means of compensating the Operators for coordinating ESR's and the Boiler Room's corrupt promotion and trading of the Manipulated Public Companies' shares. The Insiders transferred significant numbers of shares to the Operators and also retained large volumes of the Manipulated Public Companies' shares for themselves.

Once the Insiders transferred each Manipulated Public Company's shares of stock to the Operators, the defendants collaborated to execute pump and dump schemes for each stock.[5] The cold-callers and account executives at the Boiler Room (the "Account

---

[3] ESR became operational in approximately August 2013 and ceased operations in approximately December 2015. (Id.).

[4] The Boiler Room was founded under the name Dacona Financial and thereafter changed its name to Power Traders Press ("PTP"), then to Trade Masters Pro and My Street Research. (Id.).

[5] A "pump and dump" scheme is a scheme in which a group of individuals who control the free trading of unrestricted shares (the "float") of a publicly traded microcap company fraudulently inflate the share price and trading volume of the company through, among other means, wash and matched trades, press releases and paid stock promotions. When the company's share price reaches desirable levels, these individuals sell their free trading shares for substantial financial gain. (PSR ¶ 25). Wash trades are purchases and sales of securities that match each other in price, volume and time of execution, and involve no change in beneficial

Hon. Joanna Seybert
September 6, 2019
Page 4

Executives")—including Verderosa, Jean, Heepke, Ewer, Cohen, Antos and Gilbert—were primarily responsible for building a rapport with victims in order to lure them into the scheme, and then inducing them to purchase stock.[6] The Account Executives did so by following up with potential victims who had been preliminarily identified as good potential targets by cold-callers (see n.6), and then offering to sell the victims subscriptions to receive what purported to be legitimate monthly stock recommendations and research reports (PSR ¶ 33), but which were in fact materials designed to encourage victim investors to purchase shares in the Manipulated Public Companies.  (See PSR ¶ 33).  The Account Executives also recommended that the victims place orders for the stock of whatever Manipulated Public Company the defendants were promoting at the time.  When it appeared victims might have interest in purchasing stock in a Manipulated Public Company, the Account Executives aggressively and repeatedly called, emailed and texted the victims, many of whom were senior citizens, to recommend that the victims purchase shares of the Manipulated Public Company stock.  (PSR ¶ 33).

        The Account Executives, who often used one or more false names, told lies and engaged in high-pressure tactics to get the victim investors to purchase shares in the Manipulated Public Companies.  They gave the victims the false impression that the stocks of the Manipulated Public Companies were sound investments in which highly qualified professionals firmly believed. (PSR ¶ 34).  Among other things, the Account Executives did not disclose to the victim investors that when a victim investor placed a purchase order for a certain number of shares at a price the Account Executives recommended: (a) the Insiders and the Operators made a profit by selling their own shares of the company to the victim investor at the price recommended by the cold-caller, and (b) the Account Executive who induced the purchase profited by receiving a percentage, usually three percent, of the stock purchase price paid by the victim.  (See PSR ¶ 34).  The Account Executives often directed victims to log into their trading accounts to place limit purchase orders for the promoted stock at specific prices.  Often, an Account Executive instructed a victim to remain on the telephone with him or her until the victim's purchase offer was accepted.  (See PSR ¶ 33).  This was to allow the scheme to coordinate the filling of a victim's purchase order through the sale of the same stock by an Insider or Operator.   Also, by recommending that the victim place a limit purchase order (in

---

ownership.  Matched trades are similar to wash trades but involve a related third person or party placing one side of the trade.  Both wash trades and matched trades are used to create the appearance that the stock price and volume is rising as a result of genuine market demand for securities.  (See PSR ¶ 26).

   [6] At the Boiler Room, the initial victim contact was made by cold-callers, who assessed whether the victim was willing to spending money to subscribe to a financial newsletter.  Once a potential victim indicated that they might be willing to part with their money, that victim's contact information was passed on from a cold caller to an account executive for short- and long-term follow-up. Employees of the Boiler Room generally started out as cold-callers, and those with the ability to induce victims to part with their money were promoted to be account managers.  None of the defendants charged in this case served merely as a cold-caller.

other words, an offer to purchase stock at a certain price or better) at a particular price, the member of the scheme could ensure that the Insider's or Operator's stock was sold to a victim at the highest price encompassed by the limit purchase order.

When victims' investments lost value and the victims complained, the Boiler Room employed a number of different strategies. These varied, including refusing to return the victims' calls and engaging with the victims in a belligerent way. Notably, the Boiler Room also deployed cynical, predatory strategies to maximize their own corrupt profits by further victimizing the already financially compromised victims. These included persuading the victims to purchase more stock as a part of a purported strategy to "average down,"[7] and/or passing the victims on to a new Account Executive, who would acknowledge a victim's losses with the previous Account Executive, but would promise to make the losses up to the victim by providing especially valuable new stock recommendations that were sure to make money.

The Account Executives were generally compensated via a de minimis base salary, plus 50% of what was paid by each victim to whom they sold a subscription, plus a percentage, generally three percent, of the amount paid by each victim they persuaded to purchase stock of the Manipulated Public Companies. The Insiders and the Operators, who remained in constant communication regarding trading in the Manipulated Public Companies, profited through the sale of their Manipulated Public Company shares to victims at prices far higher than those at which the Insiders and Operators had obtained them (often for no money). Generally, it was agreed that for every three shares of Manipulated Public Company stock bought by victims, the Insiders were entitled to sell two and the Operators could sell one.

While the Account Executives generally did not, themselves, coordinate the match and wash trades that generated the scheme's profits, they did, however, know that their promotional efforts bolstered the criminal scheme's bottom line at the expense of the victim investors. Verderosa would alert Matz and Hardy when he had secured a victim on the telephone, and would inform them of the amount of the promoted stock the victim would purchase and the price at which the victim would make the purchase. At least one of the Operators from time to time informed the Account Executives that the Operators had Manipulated Public Company shares that they needed to get rid of, and encouraged the Account Executives to promote those shares at those times. The Account Executives also saw first-hand the way in which the stocks they were paid to promote diminished in value following the scheme's promotional efforts. Of the stocks cited in the Indictment, for example, the value of CESX and HECC was pumped up, and then plummeted, in 2014 alone. Finally, making money

---

[7] "Averaging down" is a term used to describe an investor's purchase of additional stock in a company at a share price below the investor's earlier purchase price. This brings the average price an investor has paid for shares of the company down, and could lead to greater profits in the future should the price of the company increase. Here, the technique as applied to the Manipulated Public Companies was not in the victims' interest; instead, it allowed the Insiders and Operators to sell their shares of the companies, and allowed the Account Executives to make a percentage of the purchase price.

Hon. Joanna Seybert
September 6, 2019
Page 6

at the expense of victim investors, without regard to the truth or the interests of the victims, was simply a part of the culture at the Boiler Room, as exemplified by a poem taped to the wall of the Boiler Room office entitled "The Creed." The language of the poem purports to be from "The Wolf of Wall Street," a movie that featured a 1990's boiler room that defrauded investors of millions of dollars. The poem, in vulgar language, praises telephone sales of stocks to unwilling victims, and concludes as follows: "WE'LL POUND THE PHONE AND WITH A LITTLE BIT OF LUCK, WE'LL MAKE A TON OF MONEY AND WON'T GIVE A F***." A photograph of the entire poem, as found on the office wall, is attached hereto as Exhibit ("Ex.") A.

C. The Scheme's Impact on Victims

The impact of the defendants' conduct on victims cannot be overstated. Many victims provided information with regard specifically to Verderosa, and it is discussed in greater detail in § 2(E), below. Other victims provided Probation with information, contained in affidavits and written statements, as to the defendants and the scheme generally. Additional victims provided information about the scheme at the sentencing of Emin L. Cohen.[8] By way of example, the government includes a few excerpts of this information below.

1. Probation Information

Michael L., a 65 year-old Florida-based victim-investor (GRLD, HECC, NWMH), estimates that he lost more than $30,000 as a result of the scheme and notes:

> *I also invested $5,000[] for my two grandsons, $10,000[] total, for their college funding hoping it would grow, but the $10,000 is worthless.*

Fred F., a 67 year-old Michigan-based victim-investor (ICEIF) identified in the PSR (see PSR ¶¶ 58, 60), estimates that he lost approximately $385,000 as a result of the scheme and notes:

> *I have evaluated the sentencing of the above defendants, to realize that these men and women are a danger to our society.*
>
> *These 'so called financial advisors' are 'great swindlers'.*
>
> *They are dangerously good in their deceit. I was swindeled [sic]. They are really good at this.*
>
> *They sent me fake newspaper (internet) articles about the stocks. They lied to me. They manipulated the cost factor without even me*

---

[8] The transcript of the June 7, 2019 Cohen sentencing proceedings ("Tr.") is attached hereto as Exhibit C.

Hon. Joanna Seybert
September 6, 2019
Page 7

> *realizing it, until it was too late. They know, and are very good in what they were doing. I am not.*
>
> *Unfortunately, I take full responsibility of my ignorance, by trusting them.*
>
> *I want to emphasize that these guys are great manipulators, great talkers, and we need you to protect us, from such scams.*

(Id.).

2. Previous Sentencing Information

Charles B., an 85 year-old California-based victim-investor (ICEIF), reported:

> *Over a period of about two years, we lost almost our entire life savings in the fraudulent investment schemes designed by a ring of conspirators led by a person who used an alias, Ian Grant. Day by day they used lies and misrepresentations to draw us into an ever deeper involvement. They were predators, we were their pray.*

(Tr. 71:7-16).

> *For my* [79 year-old] *wife and I, this has been a particular devastating experience, because we have so little time to regain our financial footing. These lost savings took many years of hard work to put in place . . . . We are currently living as frugally as possible. We almost never dine in restaurants, and we frequently utilize food banks that serve low-income people. We have also eliminated or cut way back on the many things that used to give us pleasure, the theatre, concerts, travel and even movies, things that have a price tag attached. This is a sacrifice in the equality of life that we deeply regret, but the money is needed for necessities, especially rent, which is high here in California.*

(Tr. 71:23 – 32:5).

D. Financial Repercussions of Stock Manipulation

The defendants' coordinated pump and dump activity artificially inflated the share price of the Manipulated Public Companies by a total of more than $147,000,000. (See Ex. B (detailing company-by-company artificial market capital value increase due to the defendants' illegal activities)).

Victims who have been in contact with Probation have assessed their personal out-of-pocket losses at more than $10,122,000 as a result of the stock fraud scheme. (See PSR ¶ 58; Addendum to the PSR, dated June 28, 2019, pp. 4-5). Based upon incomplete trading data available to it, the government estimates the victims' losses to be greater still, amounting to between approximately $14,594,777 and $16,511,591.

The defendants profited handsomely. The government has been able to trace the transfer of funds associated with the scheme into accounts owned or controlled by individual defendants in amounts varying, on a defendant-by-defendant basis, between a maximum of $4,753,241 and a minimum of $42,603.

E. Dennis Verderosa

Verderosa worked as an Account Executive at the Boiler Room between approximately May 2014 and the date of his arrest in July 2017, and before that at ESR from January 2014 to May 2014. (PSR ¶ 75). Contrary to the defense's characterization of an innocent blue-collar worker who stumbled into a bad situation, Verderosa, who had passed the series 63 licensing exam in 1996 (see PSR ¶ 75), worked as an aggressive, experienced, and prolific cold-caller who persuaded victims to purchase stocks promoted by the Boiler Room. (Id.) His skill and techniques are illustrated by the observations below of victims with whom he communicated directly on the phone and via email.

1. Victims

Verderosa's effectiveness in his role in the conspiracy is reflected in the information provided to Probation and the FBI by those who fell victim to Verderosa and his co-conspirators. Below are a few examples of the many victim impact statements submitted regarding Dennis Verderosa:

a. Victoria C.

Victoria C. ("VC") is a seventy-four year-old woman who resides in Hawaii and Tennessee. VC lost approximately $200,000 through the stocks that Verderosa pushed on her. VC reported the following in sum and substance:

In approximately June 2015, she was contacted on the phone by Verderosa. He told her that he would help her with her investments, and convinced her to buy a newsletter subscription for $100. Verderosa contacted VC nearly every morning. Over approximately two to three months, Verderosa convinced VC to sell all of the stocks she owned, including McDonalds, Walmart, and Proctor and Gamble, and to use the money to buy penny stocks recommended by Verderosa, including GRLD, HECC, NWMH, and CESX. Verderosa also convinced VC to take equity out of her house to purchase the penny stocks he recommended. Verderosa promised VC that he was going to make her one million dollars by Christmas, and that the stocks he was recommending were guaranteed winners.

Verderosa would direct VC to go to her computer and buy shares, and would instruct VC how many shares to buy. Verderosa would wait on the telephone with VC until she completed the purchases. Since VC could not purchase more than 10,000 shares at a time, Verderosa would have VC go into her account multiple times a day to purchase shares.

    b. Gregory D.

Illinois-based Gregory D. ("GD"), age 72, lost approximately $215,000 as a result of the scheme. GD reported the following to the FBI in sum and substance:

In approximately May of 2016, he received a cold call from Verderosa recommending that he purchase ICEIF stock. GD purchased approximately 50,000 shares and made approximately $800 in an overnight trade, after which he was "hooked." Verderosa connected GD with co-conspirator Sergio Ramirez, and either Verderosa or Ramirez would call GD every day. They pressured GD to buy the stocks they were recommending, telling GD that the price was going up and that he didn't want to be left behind. Verderosa or Ramirez was typically on the phone with GD when he purchased stock so that they could tell him how much to buy and at what price. A handful of times, GD bought stocks at a penny or two lower than Verderosa or Ramirez told him to. GD thought they would be proud of him, but they weren't happy and told GD not to do it again.

    c. Linda P.

Linda P. ("LP") is a 76 year-old woman based in Mississippi who lost approximately $100,000 as a result of the scheme. LP reported the following in a letter to Probation:

> *This is so hard for me to wright [sic]. I have a few days ago come home from the hospital and then the nursing home. I would have much rather been home but don't feel like I have enough money to hire someone to stay with me.*
>
> *In the summer of 2016 the presidential campaign was going on and I was listening to the tv and they were talking about the stock market and what might happen if Trump was elected and what they were saying scared me so I sold my 350 shares of Apple stock and was just letting my money lay there and thinking I could buy them back when I wanted to. Now is the time that Dennis Verderosa started calling. He would call and let the phone ring and ring and ring and after 4 or 5 minutes you couldn't stand it any more [sic]. He said I had too much money laying there not to be trading. So I finely [sic] used my money to buy some of his stock. He said he could make me rich if I would just do what he said. I always wanted to be rich. So I put some money into that stock that was suppose [sic] to go to $15 a share and when it failed he said the*

> *boys didn't fill their papers out right. They were just too young to know how to do it.*
>
> *Dennis advised me to sell the stocks I had and buy his. That was the worst time of my life. Dennis said Mark Cuban from the Shark Tank was going to get in on the stocks. So I'm thinking this is my time to get rich. What a joke!*
>
> *. . .*
>
> *He advised me to sell stocks that I had held since the early 2000's. I had 340 shares of yahoo that I had held from before they split. I sold it for $40 a share and now it has been bought by another company and is about $70 a share.*
>
> *I still hold some of the stocks he advised me to buy like Western Petroleum and the name has been changed on it and it is now about .16 a share. Will probable [sic] be zero before long. I lost thousands buying SPYR and INWP.*
>
> *I had three accounts worth about $170,000.00 when I started trading like Dennis wanted me too [sic] and I added $30,000 from my checking account. When this all went the wrong way and I had less than a $100,000 dollars in my accounts E-Trade told me that I had to add enough money to make it over $100,000 dollars. I didn't have the money so I just transferred to another firm.*
>
> *On November 18, 2014 I fell and broke my ankle and when they repaired it I had a stroke and I woke up three days later blind. My vision came back on the right side after about three weeks but not on the left side. I can't hear on my right side, but can hear a little on the left side. I have had diabetes over 42 years and diagnosed with Parkinson [sic] in 2004.*
>
> *The money I lost on Dennis's stock was to be used to redo the bathrooms in my house. I have lived in this house since 1978 and everything needs to be redone. I need help just keeping it clean and help shopping and cooking and so forth.*

    d.  <u>Hal S.</u>

Sixty-seven year-old Hal S. ("HS") hails from Utah and lost approximately $180,000 as a result of the scheme. HS reported the following in a letter to Probation:

Hon. Joanna Seybert
September 6, 2019
Page 11

> *This experience has made me feel vulnerable and chagrinned that I fell victim to this typical elder abuse scam. Right at a time when we needed to be solidifying our retirement plans, this scheme came up that seemed to offer a bit of a cushion. Instead, it has made our financial picture very tight and something we are constantly concerned about - not what we were hoping for in retirement.*
>
> *The initial introduction from Dennis Verderosa and his colleges [sic] was very subtle, emphasizing that there was little risk since no funds were sent directly to them. They offered to give us an initial free look at their website which showed the results, and suggested just investing a small amount in ICEIF. Their descriptions of what this company was doing sounded very plausible, and there was no mention of hyper returns, so it seemed very legitimate.*
>
> *As I looked at their website to verify posted results with actual results I could find elsewhere, it appeared that they were not posting new trades. I kept getting lame excuses that the person in charge of the website was just slow. Then, they talked of wanting to redo the website, and to just wait for the new one to come online. When results just didn't seem to match reality, they always had an excuse and blamed a poor website developer.*
>
> *Before long, Dennis and friends started turning up the heat. They had breaking information that big investors were about to enter and that returns would be even larger, and very soon. These events never occurred, with the price stalling or falling. They would call me, or I would call them and the answer was that the people who were shorting the stock were making life miserable, but that would only last awhile, because legally they couldn't short the stock very long. So, there was always a rosy cloud coming.*
>
> *Then they pushed me to invest more money even though I told them that I had no more available cash. That is when they pushed me to take a second mortgage. He would say that borrowing for investing was not a good idea, but in this case, with quick guaranteed results, the loan would be repaid soon and the small amount of interest paid would be justified and overshadowed.*
>
> *Once I had invested quite a bit, they would call and say it was time to pay for their services; that they could help me get out with a profit in the next 3-6 months, but only if I was still part of the system. For their help I would have to pay to stay involved.*

> *At one point, the broker even planned a trip to a nearby city and planned to meet me for a lunch get together. He never showed up.*
>
> *The net result of believing these folks resulted in me delaying retirement for a year an [sic] a half. I had invested over $180,000 with Trade Masters Pro which would have given me a significant monthly income. Instead, I am not only missing that income but am still paying on the second mortgage. Our plans for a simple retirement with some traveling has been curtailed. Instead of taking vacations or going to visit children out of state, we are constantly scrutinizing airfare trying to find some amazing discount we think we can afford. This has caused to miss out on several activities that our grandchildren have been involved in.*
>
> *This is a clear case of targeted elder abuse[.]*

2. <u>FINRA Referral</u>

In addition to the victim statements set forth above, FINRA received complaints about Verderosa through its Senior Helpline. Below is a report of a call that a concerned daughter made regarding her parents, whom Verderosa had manipulated into buying HECC and CESX, including by telling them to mail a $9,000 check directly to him:

> *Anne A[.] contacted the Senior Helpline on December 23, 2015 with concerns about her parents' involvement with Power Traders Press. Aberdeen's parents, who are both 91, have paid $12,000 in order to have access to the investment research on powertraderspress.com. She said Dennis Verderosa . . . from Power Traders Press regularly calls her parents and recommends they purchase penny stocks. She said her parents continually lose money on the recommended stocks, yet they still pay the fee to maintain access to the website. Typically, fees are paid on their credit cards, but now Aberdeen's father wants to mail a check in the amount of $9,000 to cover the most recent fees. Aberdeen said she purchased two stocks, Hydrocarb Energy (HECC) and CES Synergies Inc. (CESX), based on Verderosa's advice and they have lost a lot of money.*

3. <u>Emails</u>

Verderosa also badgered his victims over email. Below is one such email that Verderosa wrote to victim Larry L. on April 24, 2015:

*Subject: POWER TRADERS PRESS YOUR TRIAL*

*Larry,*
*I am a VERY busy man making my REAL CLIENTS a fortune with our BI-WEEKLY ISSUES in a UP OR DOWN MARKET!!!!!*
*Either you are scared to put your trust in someone OR you just have so much money you are doing this for shits and giggles, I take what I do VERY seriously and what I do is NOT LUCK it is SKILL!*
*I sent you 8 positions of which in a VOLITILE [sic] and DANGEROUS market 7 are trading up, 1 is down a bit gee, I am sorry I am not PERFECT. If your [sic] truly interested in making BIG money CALL ME.*
*Otherwise, I have no time for pikers or chasing people.*
*If you have balls.....call me otherwise, have a great life!*
*Dennis Verderosa*

### III. The Guidelines Calculation

Probation calculates the defendant's adjusted Guidelines offense level as 38 (PSR ¶¶ 89-97), and his criminal history category as I (PSR ¶¶ 102-105), leading to a Guidelines range of incarceration of 235 to 293 months (PSR ¶ 145). The plea agreement in this case estimated the defendant's adjusted offense level to be 34, and his criminal history category to be I, leading to a Guidelines recommended sentence of 151 to 188 months.[9]

### IV. Consideration of Section 3553(a) Factors

For the reasons set forth below, the government respectfully submits that a 72-month sentence is appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). Notably, the government believes that Verderosa is a more serious offender that Emin L. Cohen, whom this Court sentenced to a 24-month term of incarceration on June 7, 2019, and McArthur Jean, whom this Court sentenced to a 48-month term of incarceration on July 26, 2019. The government has been able to trace $341,883 in profits (PSR ¶ 83) that Verderosa received from the scheme (far more than the $86,168 that could be traced to Cohen and the $115,802 that could

---

[9] Probation's and the government's Guidelines estimates differ because Probation applied a four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(20)(A) for violating securities laws while a registered broker-dealer. The Boiler Room was not a registered broker dealer, and the government therefore views the enhancement as inapplicable here.

be traced to Jean). Moreover, Verderosa does not face the extraordinary family circumstances that burdened Cohen at and before the time of his sentencing.

A. Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court clarified the proper procedure and order of consideration for sentencing courts as follows: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

B. A Sentence within the Range Estimated by
the Government Is Appropriate in This Case

1. The Nature and Circumstances of the Offense

Here, as described above, the offense is particularly serious: Verderosa and his co-defendants victimized often elderly investors from around the United States, tricking their victims out of between approximately $14.5 million and $16.5 million in order to enrich themselves and their criminal co-conspirators. The devastating impact of the fraud can be gleaned from information that has been supplied by victims (see PSR ¶¶ 58-77; II(C)-(E), above).

2. The History and Characteristics of the Defendant

The defendant was one of the top performing Account Executives at the Boiler Room, personally making over three times as much money as his co-defendants Emin Cohen and McArthur Jean. Victim after victim recalled Verderosa specifically, and recounted his persuasive and aggressive tactics that convinced them to part with significant amounts of their

money, and, in many cases, left their lives in financial shambles. Although Verderosa was not a licensed broker, he did take and pass the Series 63 licensing exam, and was well aware of the illegality of the boiler room tactics and manipulative trading in which he and his co-conspirators engaged. Although Verderosa claims that he does not recall using the alias "Tony Costanza," there was ample evidence seized from the search of the Boiler Room—including lists of aliases, and charts tracking stock sales—supporting that he used that alias.

Contrary to the defense's suggestion, at the same time that Verderosa was one of the most pernicious Account Executives, there were few, if any, mitigating factors in his personal life explaining or excusing his conduct, as shown in the PSR. (See PSR ¶¶ 109-129). The defendant reported that his upbringing was "middle-income," "good," and "devoid of abuse." (PSR ¶ 111). The PSR describes a middle-class lifestyle, in which the defendant and his wife, a retired teacher, own their home in Coram, New York, and the defendant drove a Corvette.

While, at age 69, the defendant is older than many of his co-defendants – which the Court may be inclined to take into account at sentencing – it bears mentioning that he is quite a bit younger than the majority of his victims. These victims, who are in their seventies, eighties, and nineties, were deprived of tens of thousands, and in some cases hundreds of thousands, of dollars that they had worked their entire lives saving. In the case of the FINRA referral discussed in Section 2.E.2. above, Verderosa instructed two victims in their nineties to mail a $9,000 check directly to him for the cost of a newsletter subscription. If anything, the defendant's age as compared to his co-defendants should have come with the wisdom and compassion to identify that what he was doing to his victims was abhorrent.

3. Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

This was a serious offense; one involving financial fraud against elderly Americans, a crime that is all too common in our society. (See, e.g., Yuka Hayashi, Elder Fraud on the Rise, Wall Street Journal, February 27, 2019, https://www.wsj.com/articles/elder-fraud-on-the-rise-11551309306.) Verderosa and his co-defendants used their skills on the telephone to reach out to victims around the country, build these victims' trust using falsehoods, use threats to keep the victims in line when necessary, and ultimately make millions of dollars for the criminal conspiracy. As reflected above, and in the statements provided in the PSR, what Verderosa and his co-conspirators took from victims amounted to more than just millions of dollars. Ultimately, they deprived their victims of important things that victims had worked hard and played fair for all their lives. These include: health insurance; a comfortable retirement; their children's education; the security of not having to worry that much about finances as a senior; and the ability to spend time with, and provide meaningful support for, family members.

The fact that Verderosa and his co-defendants did not break windows or doors to take their victims' assets from them, that they didn't point firearms at their victims to get them to hand over their assets, and did not threaten their victims with bodily harm in no way diminishes the seriousness of this offense. Indeed, the use of technology, guile, pressure tactics and other

Hon. Joanna Seybert
September 6, 2019
Page 16

subtle and sophisticated means to achieve their criminal goals makes the defendant and his co-conspirators particularly devious and dangerous actors.

    4. <u>Affording Deterrence and Protecting the Public</u>

The Court's sentence should also further the aims of general and specific deterrence. U.S.S.G. § 3553(a)(2)(B), (C).

There is a greater need for general deterrence for sophisticated fraud schemes like this that are difficult to detect and prosecute. <u>See</u>, <u>e.g.</u>, <u>Harmelin v. Michigan</u>, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." <u>See</u>, <u>e.g.</u>, <u>United States v. Martin</u>, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005) (internal quotation marks omitted); <u>United States v. Heffernan</u>, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, <u>The Deterrent Effects of Prison: Evidence From a Natural Experiment</u>, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

Here, in light of the defendant's choice to leverage his training and skills to commit years of financial fraud in this case, there is a strong and self-evident need for specific deterrence.

V. <u>Conclusion</u>

For all the reasons articulated above, the government respectfully requests that the Court sentence defendant Dennis Verderosa to a term of incarceration of 72 months, as recommended by Probation.

Case 1:17-cr-00372-JS-GRB   Document 505   Filed 09/06/19   Page 17 of 17 PageID #: 2823

Hon. Joanna Seybert
September 6, 2019
Page 17

                        Respectfully submitted,

                        RICHARD P. DONOGHUE
                        United States Attorney

By:          /s/
                Whitman G.S. Knapp
                Kaitlin T. Farrell
                Assistant U.S. Attorneys
                (718) 254-6107/6072

Attachments & Enclosure

c.c.:    Clerk of Court (JS) (by ECF)
        Randy Zelin. (Attorney for Defendant) (by ECF and FedEx)
        Steven S. Guttman, U.S.P.O. (by Email, w/out Enclosure)